**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

ANDRE G. BOUCHARD
CHANCELLOR

New Castle County Courthouse
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: April 27, 2016
Date Decided:  June 20, 2016

Kevin R. Shannon, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19899

David L. Finger, Esquire
Finger & Slanina, LLC
1201 N. Orange St., 7th floor
Wilmington, DE 19801

Lisa A. Schmidt, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Kurt M. Heyman, Esquire
Proctor Heyman Enerio LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801

R. Montgomery Donaldson, Esquire
Polsinelli PC
222 Delaware Avenue, Suite 111
Wilmington, DE 19801

Paul D. Brown, Esquire
Chipman Brown Cicero & Cole, LLP
1007 N Orange, Suite 1110
Wilmington, DE 19801

Jennifer C. Voss, Esquire
Skadden, Arps, Slate, Meagher
  & Flom LLP
One Rodney Square
Wilmington, DE 19899

Peter B. Ladig, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

RE:   *In re:  TransPerfect Global, Inc.*
       Civil Action No. 9700-CB

      *Elizabeth Elting v. Philip R. Shawe, et al.*
       Civil Action No. 10449-CB

Dear Counsel:

      This letter constitutes my decision on the proposed plan of sale concerning

TransPerfect Global, Inc. ("TPG" or the "Company") recommended by its

custodian, Robert B. Pincus, Esquire (the "Custodian"). For the reasons explained below, the Court accepts the Custodian's recommendation to proceed with the Modified Auction (as defined below) with certain modifications discussed below.

## I.     BACKGROUND

On August 13, 2015, for the reasons explained in a post-trial memorandum opinion of the same date, the Court appointed the Custodian to oversee a judicially ordered sale of the Company and, in the interim, to serve as a third director of the Company. The opinion directed the Custodian to present to the Court "a proposed plan to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders."[1] The opinion also specifically requested that the Custodian:

> . . . evaluate the viability and the pros and cons of conducting a sale of the Company (a) in which the bidders would be limited to Shawe and Elting (individually or as part of a group), such as in a "Texas shoot out" or some other auction format, (b) in an open auction process that would include any interested bidders, or (c) in any other format the Custodian deems practicable in the circumstances of this case, which could include conducting a public offering to afford stockholders liquidity or dividing the operating assets of the Company along the production divisions that Shawe and Elting have separately managed.[2]

---

[1] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *32 (Del. Ch. Aug. 13, 2015).

[2] *Id.*

2

After his appointment, the Custodian engaged several advisors to assist in the performance of his duties. The Custodian engaged Houlihan Lokey Capital, Inc. as a financial advisor to review the Company's corporate strategy and financial position, and to assist in identifying and analyzing certain sale alternatives. The Custodian also engaged Alvarez & Marsal, a management advisory group, to provide financial and operational services to the Company, and Grant Thornton to perform an audit assessment and eventually an audit.

On February 8, 2016, the Custodian submitted a proposed plan of sale for the Company (the "Sale Report") in which he identified five alternatives he had identified and considered:

1. Division of Business. A division of the Company into distinct business units, with those units to be divided between the two stockholders in an appropriate manner.

2. Initial Public offering. An initial public offering of TPG's stock to provide a liquid market for the sale of shares by current stockholders at the time of the IPO or over time.

3. Sale to Existing Stockholder. The purchase by one stockholder of the other stockholder's shares in one of the formats detailed in [Houlihan Lokey's report].

4. Broad Auction. A customary broad auction process involving potential bidders comprised of strategic bidders, as well as financial bidders, such as private equity funds.

> 5. <u>Modified Broad Auction Led by Existing Stockholders</u>. A modified auction where each stockholder could solicit third-party investors as partners in an acquisition of TPG, and where the Custodian could work with outside bidders who are interested in partnering with an existing stockholder in connection with any acquisition.[3]

The Sale Report included a detailed analysis Houlihan Lokey had prepared evaluating each of these alternatives. The Custodian concluded that, absent a consensual resolution before implementation of a sale order, "the alternative most likely to maximize stockholder value while continuing the business as a going concern (and which can be accomplished in a reasonable time frame)" is the fifth alternative listed above, namely the "Modified Auction."[4]

The Sale Report explained that the Modified Auction "has the benefit of permitting each stockholder to bid for control of the Company (alone or in partnership with a third party), as well as permitting third parties (unaffiliated with the stockholders) to bid for the Company."[5] The Sale Report further explained that "[i]n order to fulfill the Court's directive of running the sale process," the Custodian "would need maximum flexibility without interference from the

---

[3] Sale Report 5-6.

[4] *Id.* at 7.

[5] *Id.*

4

stockholders, who may stand on both sides of a transaction."[6] To that end, the

Custodian requested that the sale order implementing the Modified Auction should

provide the following authority and discretion to the Custodian:

> (i) complete control of the auction process, including but not limited to (a) selection of management for presentations and creation of marketing materials, (b) complete discretion over the content of marketing materials, (c) determination of "qualified" bidders to participate, and the requirement and terms of nondisclosure agreements with bidders, as well as the scope of any bidder diligence of TPG (and the content of any data rooms), (d) determination of the number of rounds of bidding and the terms and conditions of any bids, (e) establishment of restrictions on communications between stockholders and bidders, and between management and bidders, (f) selection of a winning bidder based on the Custodian's reasonable business judgment, taking into account, among other things, price, terms, likelihood of consummation and other reasonable determinants, and (g) execution of all agreements required to affect the proposed sale;

> (ii) retention of financial advisors and other consultants to assist the Custodian with execution of the auction process;

> (iii) implementation of management and key employee incentive retention plans on behalf of TPG to ensure management continuity and cooperation during and after the sale process;

> (iv) expansion of each selling stockholder's existing non-compete and non-solicit arrangements, to include the entirety of TPG and its subsidiaries; and

---

[6] *Id.* at 10.

(v) execution and delivery of agreements and other documents on behalf of each selling stockholder and TPG.[7]

The items listed above are referred to hereafter as the "Delegation Provision" and the fourth item is referred to as the "Non-Compete Provision."

Elizabeth Elting, who owns 50% of the Company's shares, did not object to any aspect of the Sale Report. On March 22, 2015, Philip R. Shawe ("Shawe") and Shirley Shawe ("Ms. Shawe"), who own, respectively, 49% and 1% of the Company's shares, submitted briefs objecting to certain aspects of the Sale Report. After the parties were afforded the opportunity to fully brief the issues, a hearing was held on April 27, 2016, to consider the views of the parties and the Custodian concerning the Sale Report and the objections.

## II. SHAWE'S OBJECTIONS TO THE SALE REPORT.

Although Shawe's submission was extensive, his objections to the Sale Report boil down to essentially two key points. I address them in turn.

First, Shawe disagrees with the Custodian's recommendation to pursue a Modified Auction that would permit third parties to participate in a sale process from the outset. Shawe argues that the bidders instead should be limited, at least in the first instance, to Elting and himself. To be more specific, Shawe advocates a process that would entail Houlihan Lokey preparing a range of values for the

---

[7] *Id.* at 10-12.

6

Company and the submission of bids by the two competing major stockholders to acquire the other's stake in the Company. The stockholders could solicit third parties to provide equity or debt financing, but third parties would not be able to bid separately. The highest bid within the prescribed range would win the auction and, if neither bid fell within that range, a "go-shop" process would occur that would allow third parties to bid in a second round, while the provisional winner of the first round (*i.e.*, whoever bid more as between Shawe and Elting) would receive a matching right.

The Custodian, who has decades of experience in corporate transactions and whose expertise and independence is unquestioned, disagrees with Shawe's proposal and points out several problems with it. To start, the Company historically has not had an annual budgeting process, it has never created long-term forecasts, and Shawe and Elting have provided widely divergent estimates of the Company's value. There also is no apparent need to create a range of values up front because, under the Modified Auction, third-party buyers would engage in due diligence and create their own forecasts. Most importantly, disallowing third-party bidders in the initial round and imposing a matching right during the "go-shop" round would reduce competition in the sale of the Company, contrary to the objective of maximizing stockholder value.

The Court shares the concerns the Custodian has identified. Shawe has not provided any persuasive explanation how his proposal would better address the dual goals of maintaining the Company as a going concern and maximizing stockholder value. Shawe's proposal instead appears designed to cause needless delay and to suppress rather than to maximize stockholder value. Accordingly, I decline to adopt Shawe's proposal and accept the well-reasoned recommendation of the Custodian to proceed with the Modified Auction.

Second, Shawe opposes the Non-Compete Provision the Custodian has recommended to be included in the Delegation Provision. Shawe argues, in essence, that the Custodian should not have this authority because, unless a person has been found to have engaged in wrongdoing, the imposition of post-employment non-competition and non-solicitation obligations on a selling stockholder would impermissibly deprive that person of a property right without compensation and of the liberty to pursue the occupation of his or her choice. Shawe also contends that the two principal stockholders are not currently contractually restricted in their ability to compete with the Company after leaving

8

its employ,[8] and that the goal of maximizing stockholder value in selling the

Company as a going concern should reflect that operative reality.

The parties have identified three cases in which this Court has considered

the inclusion of non-compete restrictions as part of a judicially ordered sale of a

corporation. In two of those decisions, the Court declined to impose post-

employment non-competition restrictions in transcript rulings that give recognition

to the concerns Shawe has expressed.[9] The third decision authorized non-compete

restrictions to address threats a 50% stockholder had made *while serving as an*

*employee and fiduciary of the subject company* that were viewed as undermining

the sale process in order "to avoid paying [the other 50% stockholder] the value

that a genuine bidding contest . . . would obligate him to pay."[10]

---

[8] It is unclear whether this contention is correct. As noted in the Sale Report, Shawe and Elting each executed a non-competition agreement, dated August 8, 2000, with translations.com, Inc., a wholly owned subsidiary of TPG. Sale Report 11 n.3. It is not clear from the record, however, whether those contracts remain in place and, if so, what the nature and scope of the obligations owed under them may be.

[9] *In re Scovil Hanna Corp.*, C.A. No. 664-N, at 34-36 (Del. Ch. Apr. 20, 2006) (TRANSCRIPT) (recognizing that companies are less valuable without non-competes but "[w]hat you are supposed to do is design a sale process to maximize **the value that is there**.") (emphasis added); *In re Supreme Oil Co.*, C.A. No. 10618-VCL, at 66-67 (Del. Ch. Apr. 4, 2016) (TRANSCRIPT) (recognizing a liberty and property interest in being able to compete).

[10] *Fulk v. Wash. Serv. Assocs., Inc.*, 2002 WL 1402273, at *12 (Del. Ch. June 21, 2002).

Having given careful consideration to the arguments presented and the cited authorities, I agree with Shawe that it would not be appropriate to impose non-competition or non-solicitation restrictions on a selling stockholder as a condition of the sale of the Company absent evidence of wrongdoing. It stands to reason that TPG would be worth more to a buyer if Shawe and Elting were subject to post-employment restrictions on their ability to compete or to solicit customers and employees than it would be without those protections, but the purpose of the sale process is to maximize the value of the Company *as it is* and not to derive a hypothetically higher value based on contractual protections the Company may not currently possess.

I am not persuaded, furthermore, by Elting's suggestion that the imposition of such restrictions is justifiable because they would apply reciprocally to Shawe and Elting. The market may view one person as a greater competitive threat than the other and thus place a higher value on a non-compete from one rather than the other. To use a simple example involving two 50-50 stockholders, the market might place a value of $X on a package of non-competition restrictions for 50% stockholder A but place of value of $10X on the same package of restrictions for 50% stockholder B. In this scenario, the imposition of reciprocal non-competition

obligations would represent a disproportionate transfer of value to the Company from stockholder B.

For the reasons stated, the implementing order will exclude the Non-Compete Provision. However, the Custodian or any party may seek the implementation of non-competition or non-solicitation restrictions in the future upon a showing of good cause to address wrongful conduct in the sale process.

## III.    MS. SHAWE'S OBJECTION TO THE SALE REPORT

Ms. Shawe joins in Shawe's objections to the Sale Report except for his objection to the Non-Compete Provision, as to which she takes no position. She also contends that a third-party sale would "present a thorny allocation issue" concerning the derivative claims Shawe previously pressed against Elting, which were dismissed with prejudice in the August 2015 post-trial memorandum opinion.

I am at a loss to understand the logic of this objection. It is true, as Ms. Shawe points out, that derivative claims are "corporate assets which would be relevant to determining fair value."[11]   Whatever value these claims theoretically may have here, however, can be considered and taken into account by anyone who bids to acquire the Company and the incremental value attributable to such claims,

---

[11] *Zutrau v. Jansing*, 2014 WL 3772859, at *18 (Del. Ch. July 31, 2014), *aff'd*, 123 A.3d 938 (Del. 2015), *reargument denied* (Sept. 17, 2015), *cert. denied*, 136 S. Ct. 1198 (2016).

if any, would be shared by the stockholders in proportion to their ownership interests in TPG.

## IV.   CONCLUSION

For the foregoing reasons, the Court accepts the Custodian's recommendation to pursue the Modified Auction.  The Custodian is requested to confer with counsel for the parties and to submit an implementing order consistent with this letter decision by July 1, 2016, that (1) includes the Delegation Provision sought in the Sale Report, except for the Non-Compete Provision, (2) reserves the right for the Custodian or any party to seek, upon a showing of good cause, the implementation of post-employment restrictions (among other appropriate relief) to remedy wrongdoing intended to undermine the sale process, (3) provides that no final plan for the sale of the Company may be implemented without the approval of the Court,[12] and (4) includes such other provisions as the Custodian deems appropriate to effectuate the Modified Auction.

---

[12] Shawe's objections to the Sale Report included a contention that it improperly delegated power to the Custodian.  Shawe Opp. Br. 30-39.  In light of the requirement that the Court approve the implementation of any final sale plan, I view this objection as moot.  *See id.* at 38 ("To avoid undue delegation, the Court would have to review the structure and terms of any sale the Custodian might propose before any such sale could be consummated."); *see also In re Supreme Oil Co.*, 2015 WL 2455952, at *7 (Del. Ch. May 22, 2015) (ORDER) (requiring Court approval of implementation of final sale plan).

Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/gm